**United States District Court**
For the Northern District of California

*E-Filed 10/25/11*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CITY AND COUNTY OF SAN FRANCISCO, et al.,

                Plaintiff,

v.

UNITED STATES POSTAL SERVICE,

                Defendants.

_____/

No. C 09-1964 RS

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

The City of San Francisco, County of San Francisco, Central City SRO Collaborative, Housing Rights Committee of San Francisco, and San Francisco Tenants Union ("Plaintiffs") bring this action against the United States Postal Service ("USPS") attacking its practice of delivering mail to single-room occupancy buildings ("SROs") by way of "single-point" rather than "centralized" delivery.  Plaintiffs maintain that SROs are residences, not hotels, and that SRO tenants are thereby entitled to centralized delivery.  They allege that defendant's failure to provide centralized delivery violates the SRO tenants' constitutional rights to: (1) equal protection; (2) free speech; (3) freedom of association; and (4) privacy.  USPS contends that SROs are hotels and that SRO tenants therefore are only entitled to single-point delivery.  USPS moves for summary judgment on all claims.  For the reasons described below, while plaintiffs have standing to advance their claims, substantively the undisputed facts demonstrate the absence of any constitutional violation.  Accordingly, defendant's motion for summary judgment must be granted.

## II.  RELEVANT FACTS

Congress created the USPS in 1970 through the Postal Reorganization Act ("PRA").  *See* 39 U.S.C. § 201.  This Act gave USPS the responsibility of establishing and overseeing "an efficient system of collection, sorting, and delivery of the mail nationwide."  39 U.S.C. § 403(b)(1).  In granting this authority, Congress gave USPS the right to create specific "classification, rates, and fees" as needed, but expressly prohibited "any undue or unreasonable discrimination among users of the mails."  39 U.S.C. § 403(c).  Pursuant to this authority, the USPS delivers mail to roughly 150 million residences throughout the United States.  (Landi Dec. ¶ 4).

The USPS uses a number of different methods to deliver mail.  At issue here are single-point delivery and centralized delivery.  Single-point delivery, which defendant asserts is the cheaper and more efficient method, allows the USPS to forego sorting the mail before delivery to each location.  Rather, it is delivered in bulk.  The USPS uses single-point delivery for its service to approximately one million delivery points nationwide.  (Def's. Mot. Summ. J. at 4).  These delivery points include college dormitories, assisted living centers, and hotels.  The alternative method, centralized delivery, requires USPS employees to sort the mail before delivery and provide each resident with his or her mail in an individualized mailbox.  Generally, residences and apartment buildings receive centralized delivery.

In San Francisco, the USPS provides regular mail service, using both single-point and centralized delivery methods.  This service includes delivery to over 300 low-rent multi-unit residences called SROs.  Approximately 4% of San Francisco's population resides in SROs.  (Compl. ¶ 9).  SROs are comprised of single occupancy rooms no larger than 350 square feet.  The majority of these rooms do not include private kitchens or bathrooms; occupants use shared facilities in the common hallways.  The parties dispute whether SROs should be classified as hotels or residences for purposes of mail delivery.  Plaintiffs argue that SROs are residential units and, therefore, should receive mail through centralized delivery.  For this proposition, plaintiffs assert that SRO tenants usually remain for over a year, and note that the USPS in the past labeled SROs as "family hotels," thereby entitled to residential status triggering centralized delivery.  Additionally, plaintiffs argue that San Francisco's Planning Code classifies SROs as group housing, not hotels.

United States District Court
For the Northern District of California

The USPS disputes this residence classification, arguing that SROs have the physical and cultural attributes of a hotel: residents share facilities, do not have to pay a security deposit, and are not required to sign a lease.  Residents also frequently move from room to room or from SRO to SRO.  Furthermore, the USPS maintains that the City itself treats SROs as hotels:  Applicable municipal codes identify SROs as hotels, and the City charges them hotel taxes and a hotel license fee.  Additionally, the City requires SROs to comply with a Uniform Hotel Visitor Policy which restricts the number of guests permitted to visit each SRO tenant each day.

Whether the USPS classifies SROs as residences or hotels determines which method of mail delivery it uses.  Residences receive mail via centralized delivery and hotels via single-point delivery.  Until recently almost all SROs received single-point delivery; the mail would be left in the lobby or with a building manager, rather than sorted and placed into a separate space or box for each SRO tenant.  In 2004, however, a number of SROs requested a switch to centralized delivery.  According to the USPS, in response to "political pressure and a mistaken impression that only a small number of hotels sought conversion," local post service branches agreed to transition a few SROs from single-point to centralized delivery.  (Def's. Mot. Summ. J. at 7).

The parties debate the benefits and costs of single-point versus centralized delivery.  Plaintiffs contend that single-point delivery is less secure and leads to "frequently lost, misplaced, withheld, or stolen" mail.  (Pls'. Opp'n. to Mot. Summ. J. at 8).  Mail, they insist, is often left unattended in the building entry where any person can improperly access another's correspondence.  *Id*.  Even when delivered to a building manager, plaintiffs maintain problems arise when managers withhold mail, forget to make deliveries, or just mistakenly hand private letters to the wrong residents.  Plaintiffs insist that "[t]hese problems are inherent in the single-point delivery methods and are the root cause of this dispute."  (Pls'. Opp'n. to Mot. Summ. J. at 8, Jacobson Report ¶ 41-44).  Plaintiffs also describe a number of problems arising specifically from single-point delivery at SROs including the loss of benefits checks, the exposure of tenants' private information to their neighbors, and the misplacing of letters concerning important doctor appointments.

The USPS acknowledges the possibility that SRO residents have lost mail in the past, but emphasizes that all mail service is insecure.  In fact, the majority of mail fraud in San Francisco

United States District Court

For the Northern District of California

1    arises from individualized mailboxes.  (Rickher Dec. ¶ 5-6; Olson Dec. ¶ 20).  The USPS further

2    notes that although the Complaint maintains SRO residents account for 4% of the city's population,

3    they only comprise about 1% of all formal lost mail complaints.  (Rickher Dec. ¶ 10).

4         Debate over the security of single-point delivery in SROs led the City to enact the

5    Residential Mail Receptacle Ordinance ("Mailbox Ordinance") in 2006.[1]  The Ordinance required

6    all SRO owners to install individual mailboxes for each unit in the building.  It also instructed

7    owners to make "arrangements with the United States Postal Service for the installation of these

8    receptacles and delivery of mail thereto."  (Bushnell Decl. ¶ 4).  In response to this new statute, a

9    meeting was arranged with the USPS, housing groups, and Congresswoman Pelosi's staff.  At the

10   meeting, San Francisco Postmaster Noemi Luna represented that the USPS maintained a standing

11   policy of single-point delivery to SROs and it could not guarantee that the installation of

12   individualized mailboxes would lead to centralized delivery.  (Angelo Dec. ¶ 1-7).  She also

13   expressed her concern that the Ordinance would improperly force the USPS to modify its delivery

14   policies to SROs.  *Id.*  In response to such uncertainty, the City conceded that the Supremacy Clause

15   barred it from requiring the USPS to convert to centralized delivery for SROs.  *Id.*

16        Plaintiffs dispute that the Mailbox Ordinance was expected to have such minimal effect.

17   They contend that the Ordinance was written so that the USPS would be expected to convert all

18   SRO delivery to the centralized method in order to comply with the USPS's own Postal Operations

19   Manual ("POM").  (Pls.' Opp'n. to Mot. Summ. J at 6).  POM section 631.45 states that mail may

20   be delivered to individual mailboxes in a "residential building containing apartments or units

21   occupied by different addresses []regardless of whether the building is an apartment house, a family

22   hotel, [or] residential units."  POM § 631.45.  The presumption, according to plaintiffs, was that

23   once individualized mailboxes were installed, the USPS would follow it own manual and make

24   deliveries accordingly.  Furthermore, plaintiffs argue that once the Ordinance was enacted, local

25   USPS employees continued to convert some SRO delivery from single-point to centralized delivery.

26   (Reed Tr. 109:19-111:1).

27        In late 2008, USPS delivery managers learned that local employees had transitioned some

28
     _____
     [1] The proffered purpose of the Ordinance was to provide SRO tenants access to a more secure form
     of mail delivery.  (Buckley Decl. ¶ 7).

**United States District Court**
For the Northern District of California

SROs to centralized delivery.[2]  (Luna Dec. ¶ 14-22).  In response, on December 18, 2008, Postmaster Luna sent a letter to the City explaining that as of January 5, 2009, the USPS could no longer provide centralized delivery to those SROs that had not been provided this delivery method for more than ninety days.  Luna explained that SROs were hotels for purposes of mail delivery and providing some of them with centralized delivery had been an aberration.  *Id.*  Furthermore, the letter explained that the USPS was facing severe fiscal shortages and lacked the resources to work any further with SRO owners under the terms of the Mailbox Ordinance.  *Id.*

The City soon reacted, sending a written demand letter to the USPS on April 16, 2009. (Def's. Ex. RR).  The City's letter expressed discontent with the USPS's refusal to comply with the Mailbox Ordinance.  It also criticized the USPS's contention that "the fair treatment of San Francisco's low income residents and the security of their mail costs too much money."  *Id.* at 1. The USPS responded on April 27, 2009, reasserting its policies and contending it had not violated any laws.  (Def's. Ex. SS).  The City and County of San Francisco followed by filing suit against the USPS and individual defendants, John Potter, Michael Daley, and Noemi Luna on May 5, 2009, alleging that the USPS's mail delivery policies infringe on SRO residents' constitutional rights to: (1) equal protection of the law; (2) freedom of speech; (3) freedom of association; and (4) privacy. The Complaint also asserted a fifth claim for declaratory relief.  On August 27, 2009, defendants collectively filed a motion to dismiss the complaint in its entirety.  The Court granted the motion to dismiss with respect to the individual defendants and the declaratory relief claim, but denied the motion as to all the constitutional claims asserted against the USPS.  On September 8, 2011, the USPS moved for summary judgment on the grounds that: (1) this Court lacks subject matter jurisdiction; (2) plaintiffs lack standing; and (3) the First Amendment, the Equal Protection Clause, the Right of Association, and the Right of Privacy do not require the USPS to provide centralized mail service to SROs already receiving single-point delivery.[3]

---

[2] The parties dispute exactly how many SROs currently receive single-point versus centralized delivery.  Plaintiffs maintain that 296 SROs receive single-point mail delivery and 167 receive mail via the centralized method. (Pl's. Opp'n. Mot. Summ. J. at 7).  The USPS calculates that 324 of the 499 SROs receive single-point delivery and 172 receive centralized delivery. (Rickher Dec. ¶ 18).

[3] Plaintiffs subsequently filed a motion to strike certain evidence submitted in support of defendant's motion for summary judgment.  The Civil Local Rules require that all evidentiary and procedural objections be included with a party's brief opposing summary judgment.  *See* Civil Local

United States District Court

For the Northern District of California

### III.  LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party who seeks summary judgment bears the initial responsibility of identifying an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies this initial burden, it shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "Only disputes over facts that might affect the outcome of the suit under governing law" are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue exists if the non-moving party presents evidence from which a reasonable factfinder, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  *Id.* at 248-49.

### IV.  DISCUSSION

#### A.  Subject Matter Jurisdiction

The USPS first moves for summary judgment on the basis that this Court lacks subject matter jurisdiction.  It argues that the asserted claims challenge postal regulations and are therefore not subject to judicial scrutiny.  Plaintiffs dispute this contention, maintaining that their claims are constitutional not regulatory.

District courts have jurisdiction to consider constitutional claims brought against the Postal Service.  *See Currier v. Potter*, 379 F.3d 716, 726 (9th Cir. 2003) (distinguishing regulatory, statutory, and constitutional claims against the Postal Service for purposes of subject matter jurisdiction); *see also FDIC v. Meyer*, 510 U.S. 471, 483 (1996).  Here, plaintiffs allege that defendant violated the SRO tenants' constitutional guarantees protected by the First, Fourth, and

---

Rule 7-3(a).  Plaintiffs then filed an administrative motion for leave to file its motion to strike arguing that there is tension between Rule 7-3(a) and Rule 7-5 regarding when objections must be submitted, and further that they needed the extra pages to submit the objections because they could not fit them in the opposition to summary judgment.  No such "tension" exists between the provisions of the local rules.  Any objections must be included as part of the opposition brief. Because the proffered evidence is not necessary for the ruling on this motion, the Court need not address plaintiffs' administrative motion.

**United States District Court**
For the Northern District of California

1   Fourteenth Amendments.  The previously assigned presiding judge has already considered and

2   rejected defendant's jurisdictional arguments.  *See* Dkt. No. 28.  In the Order granting in part and

3   denying in part defendants' motion to dismiss, the Court stated that plaintiffs' "claims are

4   constitutional ones."  *Id.* at 5.  This Court has no reason to revisit that jurisdictional determination.

5         B.  Article III Standing

6         Defendant next asserts that this action may not proceed because plaintiffs lack standing.

7   Under Article III a person has standing to bring an action if: (1) they have suffered an injury "in

8   fact" that is both "actual and imminent" and "concrete and particularized;" (2) the injury is "fairly

9   traceable" to the defendant's behavior; and (3) a favorable decision by the court will likely redress

10   the alleged injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "[E]ach element

11   [of standing] must be supported in the same way as any other matter on which the plaintiff bears the

12   burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the

13   litigation."  *Id.* at 561.  Accordingly, even though general factual allegations may satisfy standing on

14   a motion to dismiss, at the summary judgment stage, a plaintiff must support each element of

15   standing with "specific facts."  *Id.*

16         1.  Injury in Fact

17              a.  The City's Injury

18         The City asserts two theories of injury in fact:  First, it contends that the USPS's single-point

19   delivery imposes additional costs on the City's benefits programs.  It explains that when checks get

20   lost in the mail or informational packets renewing benefits do not get to SRO tenants, the City is

21   forced to work with residents to reinstate benefits, reissue checks, and resolve any resulting

22   discrepancies.  This amounts not only to a burden on the City's time, but also a financial strain on

23   the government's resources, thereby causing financial injury in fact.  Second, the City maintains that

24   the USPS delivery methods have hindered its ability to inform SRO tenants about urgent public

25   health issues.  The City's public health providers rely on the mail to inform city residents about

26   pressing health concerns and to locate those who might need medical attention, allowing providers

27   to contain infectious diseases and to prevent future outbreaks.  When the mail does not reach SRO

28   residents, the argument goes, the providers cannot adequately communicate imperative health

1    messages to the public.

2          The USPS argues that the City has not established an injury in fact under either theory.  It

3    contends that the City has not provided any evidence to support its allegation of financial injury.

4    Rather, the USPS argues, the City merely recites that it has been injured, but cannot "describe a

5    single financial harm" that the City or any plaintiff has suffered.  (Def's. Mot. Summ. J. at 13)

6    Furthermore, the USPS insists that there is no evidence single-point delivery has hindered the City's

7    ability to communicate with residents about public health issues.

8          To survive summary judgment, the party seeking to pursue a federal action must present

9    specific facts of a concrete injury.  *Lujan*, 504 U.S. at 561-62.  These facts cannot be mere

10   allegations of an injury, but rather must be supported by admissible evidence.  *Id.*  Here, plaintiffs

11   submit declarations from numerous SRO tenants to support their standing argument.  The

12   declarations all recount stories of tenants failing to receive important mail from the City.  For

13   example, one tenant explains that while living at an SRO he failed to receive his acceptance letter

14   for Social Security benefits, a message from his health care provider revealing he had a dangerous

15   infection, and at least four General Assistance checks from the City.  He maintains that these

16   missing notices caused him to suffer unnecessarily from an infection and be forced to contact the

17   city on numerous occasions for check reissuances.  Another declaration tells of a SRO tenant who

18   missed his Social Security benefit hearing date when he failed to receive the letter telling him of the

19   scheduled hearing.  This same tenant also claims to have lost his General Assistance benefits

20   between 2006 and 2007 after failing to receive the City's renewal instructions.  The City presents

21   several similar narratives of tenants who missed important checks or urgent notices causing them to

22   lose government benefits or suffer physical or financial harm.  Many of the declarations attribute the

23   failure to receive mail to the USPS's bulk delivery methods.

24         Notably, these declarations largely speak of the SRO tenants' injuries and not to those of the

25   City.  To link to its own injury in fact, the City explains that each time benefit forms are lost or

26   checks are reissued, it incurs expense.  With respect to the General Assistance program, for

27   example, the City must pay between \$36.25 and \$63.33 in processing costs each time it reissues

28   benefits.  (Kelly Decl. ¶ 20).  These allegations satisfy the City's burden, at the summary judgment

United States District Court

For the Northern District of California

1   stage, to present a financial injury in fact.[4]

2                   b.   Organizational Standing

3        The Central City SRO Collaborative ("Collaborative"), the Housing Rights Committee of

4   San Francisco ("Committee"), and San Francisco Tenants Union ("SFTU") also demonstrate injury

5   in fact arising out of SRO mail delivery.  The Collaborative and the Committee claim injury from

6   the USPS's mail delivery methods through frustration of their organizational mission and the need

7   to spend resources dealing with the consequences of lost mail.  An organization may show an injury

8   for the purposes of Article III standing if it can prove: "(1) frustration of its organizational mission;

9   and (2) diversion of its resources . . . ."  *Smith v. Pac. Prop. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th

10  Cir. 2004).  Both the Collaborative and the Committee have demonstrated that they are engaged in

11  the effort to improve conditions at SROs and that they have been forced to divert resources by

12  installing the individual lockboxes that the USPS now refuses to utilize.

13       The SFTU bases its standing argument on the fact that it has many SRO residents as

14  members.  It asserts that because its members have been injured, it may assert standing on their

15  behalf.  An association has standing to sue on behalf of its members if it can show that: (1) its

16  members have standing; (2) the issues of the case are "germane to the organization's purpose;" and

17  (3) it is not necessary to have the individual members participate in the action.  *Friends of the Earth,*

18  *Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81.  SFTU is able to fulfill all three of

19  these requirements:  SRO residents who are members of SFTU have submitted declarations,

20  summarized above, which show injury in fact.  The interests at stake in this case are germane to

21  SFTU's purpose of protecting San Francisco tenants.  Additionally, neither side in this litigation

22

23  [4] To support its alternative theory, that the City's public health providers are injured by single-point
    delivery to SROs, the City submits one declaration from Deputy Health Officer Kawamura of the
24  City's Department of Public Health ("DPH").  Kawamura explains that the DPH relies heavily on
    the mail to communicate with SRO residents.  She further declares that her office has "heard
25  repeatedly that mail we have sent to residents of SROs has not reached them because of the bulk
    delivery."  (Kawamura Decl. ¶ 4).  The declaration provides no detail on how her office obtained the
26  information or any other specific facts to support the allegation that SRO residents have not received
    public health notices owing to bulk delivery.  While plaintiffs have not established injury through
27  the public health providers, for standing purposes, it has, as noted above, sufficiently shown
    financial injury.
28

1  suggests that individual residents must be personally involved in this case to obtain the requested

2  relief.

3          2.  <u>Causation</u>

4       Also critical for standing, plaintiffs must show that the mail delivery problems at SROs and

5  the resulting injuries are caused by the USPS's failure to provide centralized delivery.  Although

6  this chain of causation may have more than one link, it cannot be purely "hypothetical or tenuous."

7  *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (citing *Autolog Corp. v.*

8  *Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984), for the proposition that plausibility, not the length of the

9  causation chain, is determinative).  Rather, plaintiffs must show that their injury is "fairly traceable"

10  to defendant's conduct and not wholly attributable to a third party's independent actions.  *Tyler v.*

11  *Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000).  While mere conjecture is insufficient to show

12  causation, at the summary judgment stage, plaintiffs' showing "need not be so airtight ... as to

13  demonstrate that the plaintiffs would succeed on the merits."  *Ecological Rights Foundations v.*

14  *Pacific Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000).

15       Pointing to several SRO resident declarations in the record, plaintiffs suggest a strong link

16  between the USPS's single-point delivery methods and its asserted injuries.  One resident, for

17  example, states that when the USPS delivered to his SRO via single-point delivery, the desk clerks

18  were not careful in distributing the mail.  In another instance, a desk clerk even forged the resident's

19  name to receive a letter and then gave it to his neighbor.  The same resident attests that mail delivery

20  has substantially improved since his SRO installed individual mailboxes.  Another resident states

21  that at her SRO, identification is not required to pick up mail from the desk clerk.  This lack of

22  security makes the resident fear strangers getting access to her personal information.  While

23  plaintiffs recognize that many of these declarations describe wrongdoing by SRO employees, as

24  opposed to the USPS, they assert that this is "immaterial" as the "injury starts with the Postal

25  Service" (Pls'. Opp'n. to Mot. Summ. J. at 12).

26       Plaintiffs attempt to bolster the largely anecdotal nature of their evidence by reliance on the

27  declaration of Daniel Kelly, the Director of Planning for the City's Human Services Agency.  Using

28  a telephonic survey, Kelly declares that 36% of SRO residents admit to having problems getting

their mail.  (Kelly Dec. ¶ 17).  He further calculates that 17% of SRO residents report to having been prematurely cut off from government benefits.  *Id.*  Plaintiffs argue that, in conjunction with the residents' declarations, these figures suggest the cause of loss by SRO residents of government benefits flows from the misplaced mail connected with single-point delivery.  Defendant responds that:  (1) the USPS cannot be held responsible for the intervening acts of third parties such as building managers; and (2) Kelly's findings are unreliable in that they lack the evidentiary foundation upon which his survey is based.

At the summary judgment stage, plaintiffs need only demonstrate that there are disputed facts as to whether the USPS's single-point delivery method causes the alleged injury.  Plaintiffs have done this by exhibiting an "indirect causal relationship" which "need not be as close as the proximate causation needed to succeed on the merits of a tort claim."  *See San Francisco Baykeeper v. W. Bay Sanitary Dist.*, No. C–09–5676 EMC, 2011 WL 1990637, at \*21 (N.D. Cal. May 23, 2011) (quoting *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2009)).   In other words, plaintiffs need not claim that the USPS was the only actor causing the injury, only that it is "fairly traceable" to defendant.  *Id.*  The numerous affidavits submitted by plaintiffs demonstrate that the single-point method of delivery leads to benefit checks and public health notices being misplaced.  Accordingly, disputed material facts exist as to whether single-point delivery in fact causes the alleged injuries.[5]

### 3.  Redressability

Standing also requires a showing that a favorable court decision will likely remedy the alleged injury.  *Renee v. Duncan*, 623 F.3d 787, 797 (9th Cir. 2010).  In this regard, "plaintiffs' burden is 'relatively modest.'"  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997).  Here, plaintiffs rely on the testimony of SRO residents that once their delivery was converted from the single-point to the centralized method, they no longer suffered from misplaced checks or third party interference with their private mail.  Based on this testimony, plaintiffs assert that if the USPS must

---

[5] The USPS asserts that people complain about mail being lost when it is delivered via both single-point and centralized delivery.  They further maintain that while SRO tenants comprise 4% of San Francisco's population, only 1.4% of mail delivery complaints originate at SROs.  This, however, is not enough for summary judgment; it assumes that all SRO tenants who do not receive their mail because of single-point delivery submit formal complaints.  USPS does not present evidence to support such an assumption.

United States District Court
For the Northern District of California

provide centralized delivery to SRO tenants, the City will no longer suffer financial injury from the need to reissue benefit checks and SRO tenants will feel more secure in the privacy and security of their mail delivery.

The USPS points out that plaintiffs provide scant evidence for the proposition that benefit checks will no longer be misplaced if SROs are converted to centralized delivery.  In fact, as noted above, although SRO residents comprise approximately 4% of the city population, they make up only 1.4% of submitted mail delivery complaints.  This, however, assumes that all SRO tenants who did not receive their mail submit formal complaints.  Because at summary judgment, plaintiffs need demonstrate only disputed facts and not that their harms are "guaranteed" to be redressed by a favorable decision, this action cannot be summarily resolved on the basis of redressability.  *Id.* ("Plaintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision." (quoting *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir. 1998)).  In sum, defendant cannot prevail on its motion for summary judgment grounded on the absence of standing.

C.  Substantive Claims

1.  First Amendment

The USPS asserts that the First Amendment does not require it to provide centralized delivery to SRO residents who are already receiving single-point delivery six days a week.  The Supreme Court has long held that the First Amendment protects the right of access to the postal system.  *Blount v. Rizzi*, 400 U.S. 410 (1971).  The USPS, therefore, cannot place restrictions upon mail service which serves to infringe on these constitutional rights.  *Id.*  Courts utilize the "traditional tripartite analysis" to resolve whether the contested mail restrictions so burden a person's First Amendment's rights as to amount to a constitutional violation.  *Currier v. Potter*, 379 F.3d 716, 727 (9th Cir. 2004).  This analysis first identifies the relevant forum in which the person wishes to exercise his First Amendment rights, then determines whether it is public or nonpublic, and finally applies the level of scrutiny appropriate for the chosen forum.  *Id.* at 727 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund., Inc.*, 473 U.S. 788, 797 (1985)).

a.  Appropriate Forum

United States District Court
For the Northern District of California

The threshold question is to identify the relevant forum in which plaintiffs seek to exercise their First Amendment rights. In conducting this analysis in a challenge to mail service restrictions, the focus is not on a physical space, but the forum arises "more in a metaphysical than in a spatial or geographical sense." *Id.* at 727 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995)). In these cases, the view is "on the access sought by the speaker" rather than on the "mail system as a whole." *Id.* at 727. *But see Shane v. Buck*, 658 F. Supp. 908 (D. Utah 1985); *Spencer v. Herdesty*, 571 F. Supp. 444, 453 (S.D. Ohio 1983).

The Ninth Circuit in *Currier v. Potter*, expressly addressed the forum analysis in the context of mail delivery service. There, a homeless person sought greater access to localized general delivery and to no-fee postal boxes. *See* 379 F.3d 716. He claimed that the Postal Service's refusal to deliver his mail to a more local branch or provide him with a no-fee postal box infringed his First Amendment rights. For purposes of identifying the relevant forum, the Court focused on the particular means of communication to which Currier sought greater access for purposes of his constitutional challenge. *Id.* at 727; *see also Cornelius*, 473 U.S. at 801 (focusing on the "particular means of communication" sought by the plaintiff). The Court determined that the relevant fora were the general delivery service and the no-fee postal box. *Id.* at 727, 731-32.

Here, the parties dispute the identity of the relevant forum for purposes of the First Amendment. The USPS contends it is "centralized delivery" because this method is what plaintiffs seek. Plaintiffs, alternatively, assert that the relevant forum is "city delivery" because SRO tenants want more effective general city delivery and are simply positing centralized delivery as a remedy for their First Amendment violations.

It is undisputed that plaintiffs represent SRO tenants who want the USPS to convert their mail service specifically from single-point delivery to centralized delivery. The submitted affidavits from these tenants explicitly state that they are not able to communicate properly through the mail because of the problems associated with the single-point delivery method. They ask for greater access to a specific mail delivery system which would solve these communication obstacles. Many of these affidavits come from tenants who had centralized delivery for a short period of time and now seek to return to this precise form of mail service. Under the *Currier* analysis, the relevant

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

forum therefore is centralized, not city, delivery.  It is immaterial that centralized delivery is a method of delivery rather than a type of mail service; the *Currier* court chose "general delivery" as the relevant forum despite the fact that it was a "functional method of mail delivery."  *Id.* at 730.  In the SRO tenants' affidavits, no mention is made of a desire for greater access to city delivery generally, only requests for centralized delivery.  Indisputably, those tenants have full access to "city delivery" now in that the USPS delivers their mail six days a week, albeit utilizing a method they attack here.  Accordingly, centralized delivery is the applicable "forum."

b.  Public or Nonpublic Forum

The next question is whether the forum qualifies as a traditional public forum, a limited public forum, or a nonpublic forum.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n.*, 460 U.S. 37 (1983).  Traditional public fora include locations like streets and parks which have long been used "for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Id.* at 45.  The Supreme Court has been extremely reluctant to expand traditional public fora beyond the delineated "historic confines."  *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998).  Limited public fora, alternatively, are only created when the government makes an affirmative choice to dedicate its property to the public for the purposes of expressive activity.  *Currier*, 379 F.3d at 728.  If a forum is not a traditional or limited public forum, then it is by default nonpublic.  *Id.* at 728.  Nonpublic fora include the sidewalks outside a post office, teacher mailboxes in an interschool mail system, residential letter boxes, and the general delivery method of the postal service.  *Id.* at 729-30.  The parties do not dispute that centralized delivery is similarly a nonpublic forum.

c.  Reasonableness

Government restrictions in nonpublic forums must be both viewpoint neutral and reasonable "in light of the purpose of the forum and all the surrounding circumstances."  *Cornelius*, 473 U.S. at 789; *see Perry*, 460 U.S. at 46 ("[T]he State may reserve the [non]public forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.").  "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not

be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (emphasis in original).

It is undisputed that the USPS's decision to employ single-point delivery at SROs is viewpoint neutral: all letters, regardless of their content, are delivered via single-point delivery. The parties disagree, however, on whether the USPS's use of single-point delivery for SRO residents is reasonable. The USPS argues that its decision to deny SRO requests to convert to centralized delivery was based on careful consideration of the effects of such a transition, and submits an expert report stating that switching from single-point to centralized delivery for SROs would increase the USPS's annual costs by over $2 million. (Bradley Dec. ¶ 4). The USPS explains that it would no longer be limited to delivery just to the 322 SRO locations, but rather to 14,000 individual mailboxes within the SROs. *Id.* The USPS's expert calculates that these 14,000 additional delivery points would require the USPS to create 19 new carrier routes, each necessitating eight additional hours of work. *Id.* Furthermore, if the USPS faced forced conversion nationwide for purposes of uniformity and equality, it would create over 3.3 million new delivery points and result in $300 million in additional costs. *Id.* at ¶ 5.

Plaintiffs dispute the USPS's cost-saving analysis. They maintain the USPS lacks any evidence centralized delivery to SROs would actually cost more money. Instead plaintiffs submit their own expert report, created before that offered by defendant, which maintains that the USPS's calculations are overblown; centralized delivery would not cost USPS over $2 million a year. (Berkman Report ¶ 17-24). Furthermore, the expert submits that there are a number of other cost-saving methods that the USPS could implement to offset current losses. *Id.*

Congress created the USPS to be a self sufficient business focused on providing an "efficient and effective" mail delivery system. *Kokinda*, 497 U.S. at 731. It directed the USPS to "maintain an efficient system of collection, sorting, and delivery of the mail nationwide." 39 U.S.C. § 403(b). The USPS holds broad authority to achieve these objectives through the implementation of rules and regulations. *See* 39 U.S.C. § 401; *USPS v. Council of Greenburgh Civic Ass'ns.*, 453 U.S. 114, 123 (1981) (emphasizing the USPS's flexibility to determine the most efficient method of mail delivery). The USPS need not cater to the needs of individualized communities or citizens, but must

United States District Court
For the Northern District of California

focus on creating an effective national postal system.  *Id.*  Due to this Congressional mandate for efficiency, courts have long held that it is reasonable for the USPS to restrict mail access based on "inefficiencies" or "increased costs."  *See, e.g.*, *Kokinda*, 497 U.S. at 731 (The USPS could limit solicitation to promote efficient mail delivery); *Greenburgh*, 453 U.S. at 133 (rejecting First Amendment claim because it was reasonable for the USPS to focus on efficiency); *Currier*, 379 F.3d at 730 (finding it reasonable to reject plaintiff's request for general mail delivery because it would "overburden" the local branches and be both "cumbersome and inefficient.").  In *Currier*, the USPS claimed that expanding general delivery to homeless persons would increase costs because mail would have to have been hand sorted and time would be wasted at each branch office, resulting in substantial costs.  The Court held that "[g]iven the cost concerns and the [Postal] Service's statutory mandate to provide efficient, economical service, its decision . . . is reasonable."  *Id.*

Here, the USPS advances similar cost concerns related to the expansion of centralized delivery.  As discussed above, it submits an extensive expert report about the increased costs and inefficiencies that would result from providing centralized delivery to SROs.  (Bradley Dec. ¶¶ 29-34).  It insists that these potential increased costs are especially problematic in light of the USPS's current financial pressures, with losses of over $25 billion.  (Bradley ¶ 33).  Additionally, faced with potential default, it has recently been forced to engage in creative cost-saving measures.  These include the firing of thousands of employees, the consolidation of routes, and the closing of post office locations.  In San Francisco alone, the USPS already has eliminated 287 routes.  The prospect of adding 18.7 routes and 14,000 delivery points at SROs, according to the USPS, led it to forego centralized service at SROs.

Plaintiffs do not doubt these financial woes, but argue instead that the USPS presents no evidence single-point delivery is actually more efficient.  They again point to the testimony of their expert for the proposition that centralized delivery would cost less than an additional $2 million a year, and that the USPS might even save money by switching to centralized delivery.  That speculation aside, a close reading of the report by plaintiffs' expert does not take issue with the argument that the USPS could lose *some* amount—albeit less than $2 million—if it was forced to switch.  *See McCaw Personal Commc'ns., Inc. v. Pacific Telesis Group*, 645 F. Supp. 1166 (N.D.

**United States District Court**
For the Northern District of California

1    Cal. 1986) (considering whether one expert's comments on the opposing expert conclusions

2    mattered for the purposes of summary judgment).  While at the summary judgment stage it is not for

3    the court to weigh the credibility of the evidence or balance the expert testimony, "assertions in

4    expert declarations do not automatically create genuine issues of fact."  *W. Parcel Exp. v. United*

5    *Parcel Service of America, Inc.*, 65 F. Supp. 2d 1052, 1060 (N.D. Cal 1998).  Simply because

6    plaintiffs' expert states that USPS may not lose as much as $2 million dollars a year does not

7    operate to defeat defendant's summary judgment motion.  At summary judgment, expert opinions

8    may be analyzed in terms of the sufficiency of factual support or contradictions found in the

9    undisputed factual record.  *Id.* (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,

10   509 U.S. 209, 242 (1993).  Put simply, no facts support the conclusion of plaintiffs' expert that the

11   USPS will lose no money if forced to deliver to 14,000 more delivery points and to create additional

12   routes.[6]

13          As noted above, in establishing the USPS, Congress made clear that it was to run as a self-

14   sufficient business, giving the highest priority to efficiency.  Respecting that mandate, the USPS

15   reasonably determined that it was most efficient to conserve valuable resources in a difficult

16   economic period by continuing single-point delivery to SROs.  The USPS's decision not to provide

17   centralized delivery to SROs is reasonable and does not unconstitutionally infringe on plaintiffs'

18   First Amendment rights.

19                          2.   Equal Protection

20          The Equal Protection Clause demands generally that similarly situated people be treated

21   alike.  *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  Plaintiffs assert that SRO tenants are similarly

22   situated to apartment residents who receive centralized delivery and that the USPS's policy of using

23   single-point delivery for SROs violates equal protection.  The USPS responds that even if it does

24   treat SRO and apartment residents differently, such a distinction is rationally related to a legitimate

25   state interest.

26   ───────────────
     [6] Plaintiffs' expert asserts that defendant's calculations are inaccurate because they fail to account
27   for certain revenue offsets such as advertising mail.  In his computations, he asserts that the USPS
     would actually make 44¢ for each piece of advertising mail it delivers.  This, however, is the price
28   that the USPS receives for advertising sent via first class mail. For standard mail, the USPS only
     receives between 9¢ and 16¢.  This apparent flaw affects many of the calculations and conclusions
     in the report of plaintiffs' expert.

1    Under equal protection analysis, courts recognize that if no suspect classification is involved

2  and no fundamental right is infringed, the government "must have substantial latitude to establish

3  classifications that roughly approximate the nature of the problem perceived, that accommodate

4  competing concerns both public and private, and that account for limitations on the practical ability

5  of the State to remedy every ill." *Id*. at 216. "When social or economic legislation is at issue, the

6  Equal Protection Clause allows the States wide latitude and the Constitution presumes that even

7  improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne v.*

8  *Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citations omitted). Consequently, the general rule

9  is that the choice to treat similarly situated people differently is "presumed valid" as long as it has a

10  rational basis. *Id.*

11    Both parties agree that there is no suspect classification at issue here. Rational basis

12  scrutiny, therefore, applies to the USPS's decision to provide centralized delivery to some multi-unit

13  residential buildings and not to others. That standard simply requires the Court to determine

14  whether there is any "reasonably conceivable state of facts" to support the USPS's reason for

15  making such a distinction. *Heller v. Doe*, 509 U.S. 312, 320 (1993). The USPS submits that its

16  decision is rationally related to its "legitimate purpose of increasing operational efficiency and

17  minimizing its operational costs." (Def's. Mot. Summ. J. at 22). The Ninth Circuit in *Currier*

18  previously accepted this very argument from the USPS in the context of an equal protection

19  challenge. There, the Court held that the USPS's regulations limiting access to both general

20  delivery service and no-fee boxes were rationally related to the legitimate purpose of preventing the

21  "inefficiencies and increased costs that would result." *Id.* at 732.

22    Plaintiffs argue that *Currier*'s reasoning is inapplicable because "the law requires a rational

23  basis for the classification itself, and not just for the government action." (Pls'. Opp'n. to Mot.

24  Summ. J. at 18). They correctly claim that the USPS needs to demonstrate it had a reasonable basis

25  for *classifying* SRO residents differently from other multi-unit building tenants, not just for deciding

26  to provide different delivery methods to each group. The USPS must advance a legitimate purpose

27  for the different classifications accorded to SRO tenants and apartment residents. *See Lazy Y Ranch*

28  *v. Behrens*, 546 F.3d 580, 589 (9th Cir. 2008) (upholding an equal protection challenge when the

United States District Court

For the Northern District of California

1   defendant proffered no reason for treating conservationists differently from other bidders).  Once the

2   USPS does so, the question becomes whether the stated rationale is based in reality or merely

3   represents a pretext for an "impermissible motive."  *Id*. at 591 (quoting *Engquist v. Or. Dep't of*

4   *Agric.*, 478 F.3d 985, 993 (9th Cir. 2007)).

5          To rationalize its classification decision, the USPS asserts that SROs are hotels, not

6   apartments which receive centralized delivery.  It observes that Congress granted USPS broad

7   authority to "make reasonable distinctions among users of the mail system."  *Currier*, 379 F.3d at

8   732 n.12.  In compliance with this mandate, the USPS determined that SROs should be treated as

9   hotels for purposes of mail delivery because: (1) the City treats SROs as hotels by both taxing and

10  regulating them as such; (2) SROs physically resemble hotels, not apartments; and (3) SRO tenants

11  are more transient than apartment dwellers.  Plaintiffs challenge these proffered justifications by

12  claiming the existence of a vigorous dispute as to whether SROs are, in reality, hotels.  Indeed, they

13  point out that SROs are considered apartment houses for the purposes of receiving centralized

14  delivery under the USPS's own regulations.  *See* POM § 631.45.  By this reasoning, the USPS is

15  violating its own regulations when it treats SROs as apartment houses.

16         POM § 631.45 does in fact define residential buildings as "apartments or units occupied by

17  different addressees (regardless of whether the building is an apartment house [or] a family

18  hotel . . .)."  The regulation further states that such residential buildings may be entitled to

19  centralized delivery where individualized mail receptacles are installed.  *See* POM § 631.442.  What

20  plaintiffs fail to acknowledge, however, is that POM § 631.45 does not mandate the treatment of all

21  family hotels as residential apartments mandated to receive centralized delivery.  Rather, the

22  regulation simply states that delivery of mail to individualized boxes in these family hotels is

23  permitted if the "installation and maintenance of [such] mail receptacles is approved by the Postal

24  Service."  POM § 631.451(b).   No evidence exists in this record that the USPS approved

25  installation of mail receptacles for the purposes of converting to centralized delivery.  Rather, the

26  individual mailboxes attached to certain SROs originated as a result of the City's own Mailbox

27  Ordinance.  The fact that some local USPS branches decided on a temporary basis to use centralized

28  delivery to these mailboxes does not reflect that the USPS was required to adopt that method.  In

United States District Court

For the Northern District of California

fact, once Postmaster Luna learned of that local practice, she declared that due to financial concerns, the USPS could no longer provide most SROs with such centralized delivery.

By using single-point delivery for SROs, the USPS is not violating its own regulations in the form of the POM. As required by *Lazy Y*, the USPS has shown that the challenged classification can "reasonably be viewed to further the asserted purpose[s]" of reducing costs and maintaining operational efficiency. *Lazy Y*, 546 F.3d at 589   In *Lazy Y*, the Ninth Circuit upheld an equal protection challenge because the defendant proffered absolutely no reason for its contested classification. Similarly, in *Lockary v. Kayfetz*, the Ninth Circuit determined that the city's decision to initiate a moratorium on new water hookups did not satisfy even rational basis analysis in the face of no evidence of water shortage in the first instance.   716 F. 2d 1150, 1155-56 (9th Cir. 1990). Here, the USPS has presented legitimate reasons for treating SROs as hotels under POM. Plaintiffs are not able to demonstrate that the USPS's reasoning lacks "some footing in the realities" of the classification or that it is merely a pretext for impermissible discrimination. *Lazy Y*, 546 F.3d at 588-90.   Because rational basis scrutiny imposes a "strong presumption of validity" and requires courts to avoid judging the "wisdom, fairness, or logic" of the agency's decisions, plaintiffs' equal protection claim must fail. *See FCC v. Beach Comm'ns.*, 508 U.S. 307, 313 (1993) ("Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.'" (quoting *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980))).

### 3.   Right to Privacy and Freedom of Association

The USPS moves for summary judgment on plaintiffs' remaining claims under the right to privacy and freedom of association. [7]   In these two claims, plaintiffs assert that by providing mail through single-point delivery, the USPS burdened plaintiffs' constitutional rights by allowing "private mail to be viewed, opened, read, and discarded by SRO management, other SRO residents,

---

[7] In the Complaint plaintiffs title their fourth claim for relief: the right to privacy. Within the claim, however, plaintiffs refer to their "reasonable expectation of privacy in the contents of their mail." (Compl. ¶ 53). In defendant's motion for summary judgment, USPS interprets this claim as referring to the substantive due process right to privacy. In its opposition to the motion for summary judgment, plaintiffs characterize this right to privacy under the Fourth Amendment as the "reasonable expectation of privacy." In its reply, defendant objects to this Fourth Amendment argument, asserting that plaintiffs cannot state a new claim by way of its opposition brief. In any event, for the reasons set forth above, plaintiffs' fourth claim for relief is subject to summary judgment.

United States District Court

For the Northern District of California

and indeed anyone who happens to come into an SRO lobby." (Pl's. Opp'n. to Mot. Summ. J. at 24). The USPS maintains that these claims are subject to summary judgment because it does not have a constitutional duty to prevent third parties from interfering with the mail properly delivered to SROs.

A person has a reasonable expectation of privacy in the contents of his or her mail. *U.S. v. Jacobson*, 466 U.S. 109, 114 (1984) ([Letters and packages] are in the general class of effects in which the public at large has a legitimate expectation of privacy."). This is largely because the constitutional right to communicate and associate through the use of the mail is protected by both the First Amendment and the right to privacy. *See Wolff v. McDonnell*, 418 U.S. 539 (establishing that inmates have a First Amendment right to have the mail sent from their attorneys kept private). These constitutional rights, however, only proscribe government conduct. *Jacobson*, 466 U.S. at 113 ("[Protection from unreasonable searches and seizures] proscrib[es] only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government."). The government, therefore, cannot indirectly infringe on one's privacy through the actions of an independent third party actor. *Id.* at 113-114 (refusing to find a Fourth Amendment violation when private actors opened a person's mail). Plaintiffs in this case do not argue that the USPS infringed on their right to privacy by unlawfully opening their mail or searching through their packages. Rather, they simply argue that the USPS's method of delivery causes desk clerks and other unauthorized third parties to open plaintiffs' mail. This is insufficient to state a right to privacy or freedom of association claim. No evidence exists in this record of an unreasonable governmental search and seizure or an affirmative USPS infringement on plaintiffs' right to communicate privately through the mail. Defendant's motion for summary judgment as to claim four must accordingly be granted.

## IV.  CONCLUSION

There are no genuine issues of material fact concerning plaintiffs' First Amendment, Equal Protection, Right to Privacy, or Freedom of Association claims. The USPS's motion for summary judgment therefore must be granted.

1    IT IS SO ORDERED.

2

3    Dated: 10/25/11

         _____
4                  RICHARD SEEBORG
                   UNITED STATES DISTRICT JUDGE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California